## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 24 2020, 9:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT L.R.

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEY FOR APPELLANT S.H.

Andrew Bernlohr
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of Children in Need of Services, M.R. and T.D. (Minor Children)<br><br>and<br><br>L.R. (Father) and S.H. (Mother),<br><br>*Appellants-Respondents,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | July 24, 2020<br><br>Court of Appeals Case No. 19A-JC-2942<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark A. Jones, Judge<br><br>The Honorable Diana Burleson, Magistrate<br><br>Trial Court Cause Nos. 49D15-1906-JC-1569 49D15-1906-JC-1570 |

**Bradford, Chief Judge.**

# Case Summary

[1] S.H. ("Mother") and J.D. are the biological parents of T.D. (born October 23, 2013). Mother and L.R. ("Father") are the biological parents of M.R. (born November 24, 2018). In October of 2019, T.D. and M.R. (collectively, "the Children") were adjudicated to be children in need of services ("CHINS") due to domestic violence issues amongst the parents. Mother contends that the CHINS adjudication is erroneous as to the Children, and Father contends that it is erroneous as to M.R. Because we disagree, we affirm.[1]

# Facts and Procedural History

[2] On June 13, 2019, while at Mother's residence, Father and Mother began to argue. Mother took the Children into the bathroom, locking them and herself inside. After Father kicked the bathroom door down, Mother kicked and hit Father several times. Mother ultimately left the residence with the Children and went to the hospital, where it was determined that Mother had sustained two broken toes, a sprained wrist, and a contusion on her head. Prior to the June of 2019 altercation, Mother, Father, and J.D. had been working with the

---

[1] J.D. does not participate in this appeal.

Department of Child Services ("DCS") through an informal adjustment, which began in April of 2019.

[3] On June 19, 2019, DCS petitioned for the Children to be adjudicated CHINS. On August 15 and 16, 2019, the juvenile court held a factfinding hearing regarding DCS's CHINS petitions. Following the hearing, the juvenile court ordered the Children to be removed from Mother's care and placed in foster care and took the matter under advisement. On August 28, 2019, DCS informed the juvenile court that M.R. had been placed with Father on in-home trial visitation. On October 23, 2019, the juvenile court adjudicated the Children to be CHINS after finding the following:

> 6. In April 2019 the family entered into an Informal Adjustment (IA) agreement with DCS due to [Mother's] marijuana use during her pregnancy with [M.R.] The Court takes judicial notice of 49D09-1904-JM-422/3. As part of that agreement, the family agreed to participate in services. The IA was dismissed and this CHINS case filed due to a domestic violence incident in June 2019, mother not being compliant with services, not attending groups, and not following through with IOP at Adult and Child.
>
> 7. [Mother] has had domestic violence incidents with [J.D.] off and on throughout their relationship. They met in 2013.
>
> 8. [J.D.] was shot once when he was 16 and once when he was 25.
>
> 9. [J.D.'s] daughter, [T.D.], who was 1 year old at the time, was with him the second time he was shot. It occurred at 38th and Drexel and was a "big shootout with second older brother's cousin".

10. [J.D.] has a number of criminal cases going on involving a stolen gun, not having a gun permit, guys "putting money on him" and a recent situation with [Father].

11. [J.D.] has been locked up a couple of times because of [Mother,] but he "beat the cases". He says he has been "rippin and runnin the streets". In January 2017 [Mother] called the police because [J.D.] grabbed her around the neck, hit her and [T.D.] was present. [Mother] went to the Julian Center.

12. In June 2019 a physical altercation occurred between [Mother] and [Father]. It occurred in [Mother's] home and the children were present. During the altercation, [Mother] kicked [Father] and hurt her foot and [Father] hit her in the head. She grabbed the children and took them into the bathroom. [Father] kicked the bathroom door open and [Mother] went upstairs with the children. After a while [Mother] went back downstairs and told [Father] that she was hurt, but he said she could not leave. [Mother] went upstairs and called the police, [Father] left and [Mother] went to the hospital. [Mother] had a head contusion, sprained wrist, and two broken toes.

13. On July 22, 2019 the police were called to an incident involving [J.D.] and his ex-girlfriend [Ms. C.] When Officer Deever arrived on the scene, [J.D.] was threatening police officers and [Ms. C.] with bodily harm. He threatened to use a family member, his sister, to beat [Ms. C.] to a pulp so no one would recognize her. [J.D.] said he would have his family come back and get the officers. Officer Deever was concerned for his safety. [J.D.] was extremely agitated and had to be detained. [J.D] was aggressive, threatening, loud and belligerent, and the neighbors were woken up. Once in the wagon he yelled "I'll be back, don't you worry." [J.D.] is on GPS release.

14. Two and a half weeks ago, [Mother] was at home, [J.D.] and his fiancé [*sic*] came to get [T.D.] [J.D.] was taking his time to leave; but eventually left with [T.D.] [Father] came to take [Mother] to the store. When he saw [Father] come to the house,

[J.D.] came back to [Mother's] back door and pushed his way into the house. He was yelling about [Father]. [J.D's] fiancé [*sic*] grabbed [T.D.] and put her in the car. [Mother] put [M.R.] in a stroller, and took off. [J.D.] was still at [Mother's] house. [Mother] went a short distance from the house at 16th and Priscilla, and waited 20 minutes to see if [J.D.] would leave. When she didn't see him, she walked back to her apartment. [J.D.] was in the house in a chair. [Mother] was fearful for hers and her child's lives, so she left and walked to Taco Bell. [Father] was there. As [Father] was walking up to the Taco Bell, [Mother] saw [J.D.] approaching. [Mother] said something like "There's [J.D.], you need to go." [J.D.] picked up bricks and launched them at [Father's] car. [Father] told [J.D.] that he didn't have a problem with him. [J.D.] said that he was going to kill [Father]. [M.R.] was present during this argument. [Mother] was close enough to the fathers to hear the argument.

15. [Mother] called Ms. [Ieva] Grundy from Taco Bell and told her that she was fearful. [Mother] did not call the police because she was afraid her children would be taken away from her. Ms. Grundy said that if she came, she would take [Mother] to a shelter. [Mother] did not want to go to a shelter.

16. [J.D.] called in a police report about the Taco Bell incident and described [Father] as having dreads (which he did not), driving a Buick (which he was not doing), and pointing a gun at him and threatened that he wanted to "blow [J.D.'s] noodle back right now." Noodle as used in this sentence means "brain". There was no corroboration of this story.

17. [Mother] has received text messages from [J.D.] – threatening her life, name calling, going to cut her and do bad things to her.

18. On August 1, [Mother] agreed to give custody of [T.D.] to [J.D.] because she thought it would "cut down on the confusion", not because it was in the best interest of her child.

19. According to the home based case manager, Ieva Grundy, who has years of experience working with families which have experienced domestic violence, children who are in an environment with arguing, domestic violence, are not healthy because they are traumatized by that. This exposure stunts developmental and emotional growth. Even if children are in another room, they can hear it and feel the tension. Ms. Grundy had one encounter with [Mother] and [J.D.] together. She told them that they needed to grow up and that this was about the safety of their child.

20. Ms. Grundy's goals with [Mother] were for her to get clean and sober, enroll in recovery and domestic violence classes at the Rose Project, get a CAN license and get permanent employment.

21. The FCM assigned to this case, Gwen Grant, has 25 years providing working at a mental health center in New York providing services to families. She described the relationship between [J.D.] and [Father] as toxic. There has been domestic violence between [Mother] and [J.D.] on and off. [J.D.] gets angry and goes off. [Mother] has told FCM Grant that she is tired of [J.D.] and [Father]. She says she is tired, she is done. The FCM is concerned about the ongoing violence between the fathers.

22. In August 2019, Jeremy Noble was the assigned visitation facilitator from [Father] and [M.R.] At one of the visits on August 8, 2019, Mr. Noble took [M.R.] and [Father] to a splash pad. When they arrived, [Mother] and [T.D.] were there in a car. Mr. Noble told her that this visit was with [Father] only and that she would have to leave. She walked away but was still near.

23. [Father] told Mr. Noble that his relationship with [Mother] was good in the beginning, but now it was not healthy. [Father] is making efforts to co-parent [M.R.]

24. Ms. Grundy has met [Father] and seen him and [Mother] together with [M.R.] [Father] was engaged, loving and gentle.

When he and [Mother] lived together she saw them together and they seemed to get along. [Father] and [J.D.] do not get along.

25. On August 13, 2019, [Mother] said she was not going to make [M.R.] available for a visit. [Mother] was tired of [Father] calling her and cancelling visits and she was not going to do it anymore, if he wanted to see her he would have to go to court. She hung up on him.

26. According to [Mother], it is getting stressful and hard to provide financially for the children. She works at two temporary agencies. She is unable to get CCDF because they want the fathers to be paying child support. [Mother] voluntarily gave [J.D.] custody of [T.D.] and is not receiving child support from him. There is a paternity case at juvenile court under which [Mother] could have requested child support.

27. The Court finds that the children are in need of services. It is clear that [J.D.] and [Father] do not get along, and the triangulation with mother which includes continued regular contact between her and the fathers has created a chaotic environment for the family. The children have been present during some of the violent incidents between the parents and [T.D.] was with her father when he was shot. [Mother] is tired of [J.D.] and [Father]. She is fearful of [J.D.] [J.D.] and [Father's] relationship is toxic to the point that [J.D.] has alleged that [Father] has been involved in violent activity which has not occurred. It is difficult for [Mother] to provide financially for the children. The relationship between the parents and the violence exhibited creates a home environment for the children which causes trauma. The parents need services to learn how to co-parent together. [T.D.] needs therapy to address the violence that she has been exposed to. [M.R.] needs to be in an environment without violence. DCS was minimally involved with the family through in Informal Adjustment agreement (IA), but that was violated due to [Mother] not participating with services and two domestic violence incidents since the IA was opened. The parents have not been able to provide a living environment free

from domestic violence, therefore the coercive intervention of the court is necessary.

Appellant's App. Vol. II pp. 130–32.[2] On November 13, 2019, the juvenile court held a dispositional hearing, at which it ordered Father to complete home-based therapy and Mother to complete home-based therapy, home-based case management, and domestic violence services.

# Discussion and Decision

[4] Mother and Father contend that there was insufficient evidence to support the CHINS adjudications. It was DCS's burden to prove by a preponderance of the evidence that the Children were CHINS. *T.Y.T. v. Allen Cty. Div. of Family and Children*, 714 N.E.2d 752, 756 (Ind. Ct. App. 1999). "We review the sufficiency of the evidence by considering only the evidence favorable to the judgment, together with the reasonable inferences to be drawn therefrom." *Id*. We neither reweigh the evidence nor judge witness credibility. *Id*.

[5] Pursuant to Indiana Code section 31-34-1-1, in order to adjudicate a child a CHINS, DCS must prove that

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, or education, or supervision:

---

[2] Appellant's Appendix refers to Appendix – Appellant (LR) in the record.

(A) when the parent, guardian, or custodian is financially able to do so; or

(B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Our Indiana Supreme Court has interpreted this provision to require "three basic elements: that the parent's action or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.M.*, 45 N.E.3d 1252, 1255 (Ind. Ct. App. 2015) (quoting *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014)).

[6] The juvenile court, *sua sponte*, entered findings of fact and conclusions of law in its order adjudicating the Children to be CHINS and therefore our review is subject to Indiana Trial Rule 52(A). *Matter of N.C.*, 72 N.E.3d 519, 523 (Ind. Ct. App. 2017).

> For issues covered by the juvenile court's findings, we first consider whether the evidence supports the factual findings and then consider whether those findings support the juvenile court's judgment. We will not set aside the findings or judgment unless they are clearly erroneous. Findings are clearly erroneous when there are no facts in the record to support them; a judgment is

clearly erroneous if it relies on an incorrect legal standard. We give substantial deference to the court's findings but not to its conclusions. Any issues not covered by the findings are reviewed under a general judgment standard and the judgment may be affirmed if it can be sustained on any basis supported by the evidence.

*Id.* (internal citations omitted).

[7] Here, we conclude that the juvenile court properly adjudicated the Children to be CHINS. Regarding the first element, Mother's, Father's, and J.D.'s actions and inactions have seriously endangered the Children. We agree with the juvenile court's characterization of the relationship between the three adults as a "triangulation" relationship that has created a living environment for the Children that is chaotic and rife with domestic violence. Incidents of domestic violence between Mother and J.D. have occurred throughout their relationship, beginning in 2013. We find it troubling that Mother's solution to stopping J.D. from coming to her residence and causing problems between the adults was to give him custody of T.D. Despite Mother giving J.D. custody of T.D., J.D. testified at the factfinding hearing that he was living at Mother's residence, which she disputed. Moreover, in June of 2019, an altercation occurred between Mother and Father, during which Father kicked down the bathroom door; Mother kicked Father; and Mother sustained two broken toes, a sprained wrist, and contusion to her head. The Children were present during this altercation. Jeremy Noble, Father's visitation supervisor, testified that Father told him that he and Mother's relationship started out well but has become

unhealthy. Finally, in August of 2019, Father and J.D. were involved in a verbal altercation that took place at a Taco Bell, during which J.D. threw bricks at Father's car and threatened to kill Father. M.R. was present during this altercation.

[8] Regarding the second and third elements, we conclude that the Children's needs were unmet and likely to remain unmet without the juvenile court's intervention. Home-based case manager Grundy testified to her concerns regarding the Children as follows:

> Q    What are your concerns?
>
> A    My concerns is that children who are in this kind of environment with a lot of arguing, domestic violence is not healthy for kids.
>
> Q    Why not?
>
> A    Because they [are] traumatized by that -- even as small infants. They are traumatized by that and it is not -- it stu[nt]s their developmental growth, their emotional growth and I do have concerns about these children in that environment with all three of these parents.
>
> Q    Even if the children are in a different room when something happens?
>
> A    Yes.
>
> Q    Well, they can't see it?
>
> A    Right, but they can hear it and they can feel the tension in the rooms between their parents.

Tr. Vol. II pp. 54–55. Further, family case manager Grant testified that if the CHINS petition was dismissed by the juvenile court, she would be concerned that "there would be ongoing [domestic violence] amongst the family members and that someone would eventually get hurt. If not the parents, one of the kids." Tr. Vol. II p. 94. Finally, Mother, Father, and J.D. were given an opportunity to address their issues without the juvenile court's intervention through an informal adjustment starting in April of 2019 but were unable to do so. Their inability was demonstrated through continuous altercations amongst one another, especially in June and August of 2019, making it necessary for the juvenile court to intervene to ensure that the Children have a living environment that is safe and free from domestic violence. Mother and Father have failed to establish that the CHINS adjudications were erroneous.

[9] In arguing that the CHINS adjudications were erroneous, Mother attempts to place the blame on Father and J.D., and Father blames J.D. While we believe there is more than enough blame to go around, we need not conduct a separate analysis for each parent, but rather, determine only if the Children are CHINS, which we have already so concluded. *See In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010) ("Because a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage … Indeed, to adjudicate culpability on the part of each individual parent in a CHINS proceeding would be at variance with the purpose of the CHINS inquiry: determining whether a child's circumstances necessitate services that are unlikely to be provided without the coercive intervention of the court.").

[10] Father also seemingly argues that because M.R. has been placed in his care and he is an appropriate parent and caregiver, M.R.'s adjudication as a CHINS is erroneous and violates his due process rights as a parent. Father's argument, however, misses the mark for numerous reasons and need not detain us long. First, it was M.R.'s living environment while under Mother's care, not Father's, that was before the juvenile court. Second, Father significantly diminishes his involvement in creating an environment for M.R. filled with domestic violence. Both the June and August of 2019 altercations directly involved Father. Third, as M.R.'s current caregiver, Father is likely going to have to interact with the other individuals involved in these altercations in the future, which means he needs to learn how to effectively co-parent with them. Finally, it is the juvenile court's order removing M.R. from Mother's care and subsequent CHINS adjudication that has allowed M.R. to be placed in Father's home. Absent these CHINS proceedings and subsequent adjudication, we see no reason why M.R. would not still be in Mother's care.

[11] The judgment of the juvenile court is affirmed.

Baker, J., and Pyle, J., concur.